# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

_____

| | |
|---|---|
| In Re:<br>**GLORIA GALAN and**<br>**JULIO I. SILVA,**<br><br>Debtors. | **Bankruptcy Case**<br>**No. 10-40013-JDP** |

_____

| | |
|---|---|
| **SHYLOH MASUO and**<br>**JOSHUA BECKER,**<br><br>Plaintiffs,<br>vs.<br><br>**GLORIA GALAN and**<br>**JULIO I. SILVA,**<br><br>Defendants. | **Adv. Proceeding**<br>**No. 10-08036** |

_____

## MEMORANDUM OF DECISION
_____

**Appearances:**

David M. Fogg, FOGG LAW, Eagle, Idaho, Attorney for Plaintiffs.

James C. Meservy, WILLIAMS, MERSERVY & LOTHSPEICH, LLP,

MEMORANDUM OF DECISION - 1

Jerome, Idaho, Attorneys for Defendant Gloria Galvan.

Seth C. Platts ROY, NEILSON, BARINI-GARCIA & PLATTS, Twin
Falls, Idaho, Attorney for Defendant Julio Silva.

### Introduction

This litigation arises out of a tragedy.

During fourteen-month-old "B.B.'s" second day at Happy Feet Day

Care, he was found asphyxiated during nap time.  B.B.'s parents, Shyloh

Masuo and Joshua Becker ("Creditors"), later filed a state court action

against Gloria Galan ("Debtor"), the owner and operator of Happy Feet,

and were awarded $1,267,815.83 in damages in a default judgment.  When

Debtor subsequently filed for chapter 7[1] bankruptcy relief, Creditors

commenced this adversary proceeding seeking a determination that the

state court judgment debt is excepted from discharge in Debtor's[2]

---

[1]  Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all rule references are to the
Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

[2]  Creditors' default judgment was awarded against both Debtor and her
spouse, Julio Silva ("Silva").  Exh. 102.  Debtor and Silva filed a joint chapter 7
bankruptcy petition,  Bankr. No. 10-40013-JDP, Dkt. No. 1, and both were named
(continued...)

MEMORANDUM OF DECISION - 2

bankruptcy case under § 523(a)(6) because it resulted from a willful and

malicious injury.

After conducting a trial on this action on July 7 and 8, 2011, at which

the parties offered evidence, testimony, and legal arguments, the Court

took the issue under advisement.  Having considered the evidence and

record, the parties' arguments, and applicable law, this Memorandum sets

forth the Court's findings of fact, conclusions of law, and reasons for its

decision.  Rules 7052, 9014.

## Facts and Background

## I.    Debtor's background.

Debtor has an extensive employment history working with children.

Exh. 106.  Since 1979, she has worked in the education and child care fields

nearly continuously.[3]  *Id.*  Among her jobs, Debtor taught elementary

---

[2](...continued)
as defendants in this action.  At trial, however, Creditors stipulated that Silva
committed none of the acts giving rise to this adversary proceeding.  Creditors
are, therefore, no longer seeking an exception to discharge as to Silva.

[3]  Debtor has taken occasional breaks from child-oriented employment, or
(continued...)

MEMORANDUM OF DECISION - 3

school classes, and was an elementary school teacher's aide, an on-call day

care substitute for multiple facilities, an on-call substitute elementary

school teacher, and a family educator for the Head Start early childhood

education and development program.  *Id.*

Along the way, Debtor obtained multiple child care and safety

certifications and credentials.  Exh. 105.  She has received instruction in:

child abuse and neglect; substance abuse; HIV/AIDS; nutrition; first aid,

including pediatric first aid; CPR, including infant and child CPR; and

social services delivery.  *Id.*  While the evidence includes records of

Debtor's training, it does not include details on the specific information

presented in each training.

## II.   Happy Feet Day Care.

Debtor opened Happy Feet Day Care on a limited basis in June 2007,

_____

[3](...continued)
has overlapped her child-oriented employment with other types of work.  For
example, Debtor has, at times, worked as an entertainment organizer, caterer,
taxidermy assistant, radio disc jockey, and pharmacy technician.  Exh. 106.  She
has also served in a number of civic roles, including a four-year term as a Twin
Falls City Councilwoman.  *Id.*

MEMORANDUM OF DECISION - 4

providing care for up to six children at a time.  *See* Exh. 103 at 32:1–2.  In

February 2008, she secured a Day Care Permit, Exh. 109, and a Group Day

Care Facility Certification from the State of Idaho, Exh. 112.  Under these

permits, Happy Feet could care for up to twelve children at a time, and

Debtor expanded her operation accordingly.  *See* Exh. 112.

Debtor operated Happy Feet out of a small, leased house in Twin

Falls in which she resided.  From its inception, Debtor was Happy Feet's

only full-time employee.  At the same time, unpaid "helpers" assisted

Debtor in caring for the children.  Among those helpers were Debtor's son

Valentino Nevarez ("Nevarez"), and his girlfriend Hilda Gonzalez

("Gonzalez").[4]  Neither Nevarez nor Gonzalez had any specific training or

experience in child care.

Within the house, particularly at nap time, Debtor used different

rooms to separate older children from younger children, and younger

children who would frequently "whine and cry" from the younger

---

[4] Despite not being paid by Debtor, both Nevarez and Gonzalez indicated
"Happy Feet Day Care" as their "Place of Employment" in their July 3, 2009,
written statements to the police.  Exh. 104 at 21, 23.

MEMORANDUM OF DECISION - 5

children who would sleep.  Exh. 119 at 11:30–44.  All younger children were laid in individual playpens at nap time.

In addition to the playpens, Happy Feet frequently placed children in booster-type car seats.[5]  *See* Exh. 118 at 13:41–46.  The booster seats were manufactured with 5-point harnesses, and were designed to be used, depending on the height and weight of a particular child, with either the 5-point harness, or a vehicle's shoulder belts, to secure the child.[6]  Exh. 114. When used in a vehicle, the seats' 5-point harnesses must be used on children between twenty and thirty pounds, and on those whose shoulders are below the highest possible shoulder harness setting.  *Id.*

However, Happy Feet did not use the seats for vehicular travel, and Debtor therefore modified the seats' harnesses from a 5-point to a 3-point

---

[5]  How Debtor typically used the seats is unknown, though it was not for vehicular transportation.

[6]  The seats' instruction manual is written from the perspective that they will be used in a motor vehicle.  Their primary purpose is to protect a child in case of a motor vehicle accident, and the safety guidelines appear to be written with that specific goal in mind.  It is unclear what effect alterations to the design, or the use of the seats in a non-vehicular setting, may have on the seats' safety.

MEMORANDUM OF DECISION - 6

system.[7]  The relative safety of using the seats outside of a vehicle, and

with only a 3-point harness system to secure an occupant, is unclear from

the evidence.  The critical booster seat's owner's manual, which was

admitted in evidence, indicates that a failure to follow the manual's seat-

use, harness, and other warnings and instructions could result in injury in

a vehicular accident.  There are no specific instructions or warnings,

however, about out-of-vehicle use, and, particularly, about out-of-vehicle

use with a modified 3-point harness.[8]  The only warning relevant to this

proceeding appears to be one advising the user to "NEVER leave [a] child

unattended."  Exh. 114-01 (emphasis in original).  Yet, even that warning

was never read by Debtor, who never read the manual.

---

[7]  The number of "points" within a particular harnessing system refers
simply to the number of contact points between the harness and the booster seat.
In other words, a 5-point harness attaches to the seat in five different locations,
whereas the modified 3-point harness attaches only in three.

[8]  While there are warnings in the manual such as, "[u]se this child
restraint only on forward facing vehicle seats," those appear targeted towards
correct usage of the booster seat within a vehicle.  There are no clear statements
in the manual prohibiting use of the seat outside of a vehicle.

MEMORANDUM OF DECISION - 7

### III.     The July 3, 2009, incident.[9]

The week before July 3, 2009, Creditors visited Happy Feet and

discussed the day care's practices with Debtor.  Debtor described the day

care's discipline policies and procedures, and Debtor and Creditors

discussed the terms of Happy Feet's service.  Upon conclusion of that visit,

Debtor and Creditors agreed Happy Feet would begin caring for Shyloh

Masuo's three children,[10] including Creditors' son, B.B, two days a week.

B.B.'s first day in Happy Feet's care, June 27, 2009, was completed

without any apparent incident.  July 3, 2009, was B.B.'s second day at

Happy Feet.  Present that day were Debtor, Nevarez, and Gonzalez

---

[9]  The information submitted in evidence surrounding the July 3, 2009,
incident is somewhat muddled.  Since that time, the adults involved have
refused to talk to others about the relevant events, often invoking the Fifth
Amendment privilege against self-incrimination to support their refusal to
comment.  Based on our review of the record, including July 3, 2009, interview
reports and statements of the responsible adults, Exhs. 118, 119; the 911 call, Exh.
117; a deposition of Debtor, Exh. 103; police reports, Exh. 104, and the limited
information gleaned from trial testimony, the Court accepts the series of events
described herein as fact.  Unless otherwise indicated, the facts recited in this
section are a narration extracted from the documents and sources noted.

[10]  The relationship between Shyloh Masuo's elder-two children, who have
different last names, and creditor Joshua Becker is unclear.

MEMORANDUM OF DECISION - 8

("responsible adults"), as well as several other children.

B.B. arrived at Happy Feet sometime between 10:00 and 10:30 in the morning, and began to fuss and cry almost immediately.  He cried incessantly most of the morning.  Debtor attempted to pacify B.B. by holding him, rocking him, laying with him, giving him a bottle, and placing him in a playpen, none of which worked.  The responsible adults at Happy Feet attempted to feed B.B. his lunch meal, but he would not eat, and, instead, threw his food on the floor.

Eventually, the only treatment found to moderately placate B.B. was to place him in one of Happy Feet's booster seats.  Seeing that, Gonzalez fastened B.B. into a booster seat, then lifted and placed that seat into one of the playpens in a small bedroom.  She did not secure the booster seat to the playpen in any manner.  While Gonzalez is the only responsible adult to have admitted placing B.B. in the seat and playpen,[11] Debtor was, at

---

[11]  While there is no evidence to the contrary, the Court harbors some doubt about whether Gonzalez, who was approximately seven months pregnant at the time, had the physical ability to lift the nearly thirty pound seat and child up and over the railing of a portable playpen by herself.

MEMORANDUM OF DECISION - 9

least, present when the decision to do so was made.[12]

Once Gonzalez placed the booster seat in the playpen, which occurred some time between 1:30 and 2:00 p.m., the responsible adults all left B.B. to cry in the room, unattended.  After a short time, B.B.'s crying abated,[13] and, at about that time, Debtor left to go to the bank.

One other fussy child had been left in the room with B.B., and, around 2:10 p.m., Gonzalez entered the room to get a diaper for that child. Upon entering, Gonzalez saw B.B. slumped over in his seat.  She tried to wake him, and turned on the light.  Seeing that B.B.'s lips were blue, Gonzalez removed him from the car seat, placed him on the couch, and screamed for Nevarez, who immediately phoned 911.[14]  Nevarez talked to the 911 operator while attempting CPR, and paramedics and police

---

[12]  Debtor's July 3, 2009, written statement to the police indicates, "*we* moved him to put [the] car seat in [the] playpen to secure him . . . ."  Exh. 104 at 20 (emphasis added).

[13]  Debtor's July 3, 2009, written statement indicates that B.B. quieted down "around 2 [p.m.]"  Exh. 104 at 20.

[14]  A transcript and audio recording of the 911 call from Navarez were submitted in evidence.

MEMORANDUM OF DECISION - 10

personnel soon arrived.  While medical personnel were able to temporarily

revive B.B., he died on July 5, 2009.  The Ada County Coroner, at Twin

Falls authorities' request, performed an autopsy, and opined that B.B.'s

death was caused by asphyxiation resulting from entrapment of his neck

while in a car seat; the coroner determined the death to be accidental.  Exh.

100.

The Twin Falls Police Department initiated, and, as far as the Court

can tell, continues, an investigation into the incident.  *See* Exh. 200.  As part

of this investigation, the police contacted the Child Advocacy Center, the

Idaho Department of Transportation, and the American Academy of

Pediatrics, none of which have studied or heard of other out-of-vehicle car

booster seat deaths.  Exh. 104 at 11–12.

## IV.    The state court action.

Shortly after B.B.'s death, Creditors sued Debtor in state court.  *See*

Exh. 101.  Debtor did not respond to Creditors' complaint, and a default

judgment was entered on November 16, 2009.  *Id.*  The judgment was

amended January 5, 2010, and Creditors were awarded damages in the

MEMORANDUM OF DECISION - 11

amount of $1,267,815.83, plus interest, against Debtor.  Exh. 102.  Without

Debtor providing any evidence to the contrary, the state court judge

accepted Creditors' allegations concerning Debtor's conduct in their

complaint as fact, whatever those allegations were.[15]  *Id.*  Based upon the

allegations, the state court found Debtor's conduct, at least as it was pled,

to be "reckless."  *Id.*

Debtor filed a chapter 7 bankruptcy petition on January 7, 2010.

Bankr. No. 10-40013-JDP, Dkt. No. 1.  Creditors commenced this adversary

proceeding, seeking to except the state court judgment from discharge

under § 523(a)(6), on April 1, 2010.  Adv. No. 10-8093, Dkt. No. 1.  Debtor

denied the debt is excepted from discharge.  Dkt. No. 7.  While Debtor was

called as a witness to testify during trial, she asserted her Fifth

Amendment privilege against self-incrimination in declining to answer

most of Creditors' attorney's substantive questions.  Creditors argue that

Debtor's use of the Fifth Amendment privilege in this fashion in this

---

[15]  This Court's record did not include Creditors' state court complaint.

MEMORANDUM OF DECISION - 12

adversary proceeding independently justifies excepting Creditors' debt

from discharge.

## Discussion

## I.    Creditors have not shown that their debt is excepted from discharge under § 523(a)(6).

Typically, a chapter 7 debtor is entitled to a discharge of all of her

prebankruptcy debts.  *See* §§ 727(a), (b).  Depending upon the facts of each

case, though, specific debts may be excepted from bankruptcy discharge.

§ 523(a).  Among the debts that will not be subject to a chapter 7 discharge

are those "for willful and malicious injury by the debtor to another entity

or to the property of another entity."  § 523(a)(6).

A creditor must prove the elements required to except a debt from

discharge under § 523(a)(6) by a preponderance of the evidence.  *See*

*Molina v. Seror* (*In re Molina*), 228 B.R. 248, 251 (9th Cir. BAP 1998) (citing

*Grogan v. Garner*, 498 U.S. 279 (1991)).  An exception under § 523(a)(6)

requires proof of two primary, separate elements:  (1) that the debtor's

conduct in inflicting injury on another was willful; and (2) that the debtor's

MEMORANDUM OF DECISION - 13

actions inflicting the injury were malicious.  *Barboza v. New Form, Inc.* (*In re
Barboza*), 545 F.3d 702, 706 (9th Cir. 2008).  In this case, Creditors have not
proven by a preponderance of the evidence that Debtor acted willfully and
maliciously.

### A.     Creditors' standing to prosecute this § 523(a)(6) action.

Before proceeding further, the Court must determine whether
Creditors, B.B.'s parents, may assert a § 523(a)(6) action against Debtor
based on injuries suffered by B.B.  This issue arises because, to seek
exception from discharge pursuant to § 523(a)(6), a party must be a
"creditor" to whom a debt for willful and malicious injury is owed.
§§ 523(c)(1); 523(a)(6).

In Idaho, parents may maintain, and recover damages, in an action
for their child's wrongful death.  Idaho Code § 5-311; *Hayward v. Yost*, 242
P.2d 971, 977 (Idaho 1952).  To determine whether such a wrongful death
judgment debt is dischargeable under § 523(a)(6), bankruptcy courts
examine whether debtors' conduct toward the deceased meets § 523(a)(6)'s

MEMORANDUM OF DECISION - 14

willful and malicious standards.  *See, e.g.*, *Duncan v. Duncan* (*In re Duncan*),
448 F.3d 725, 729–30 (4th Cir. 2006); *Dufrene v. Paille* (*In re Paille*), 2009 WL
3199187 (Bankr. E.D. La. 2009); *Beland v. Cunningham* (*In re Cunningham*),
365 B.R. 352, 359–60 (Bankr. D. Mass. 2007); *Au v. Johnson* (*In re Johnson*),
2007 WL 1728721 (Bankr. D. Mont. 2007).  Therefore, since Creditors, who
were the plaintiffs in state court, obtained a wrongful death judgment
against Debtor for B.B.'s injury, they may bring this § 523(a)(6) action.  The
Court will look to Debtor's conduct toward B.B. to determine whether her
actions were willful and malicious.

**B.    Debtor did not willfully injure B.B**.

Section 523(a)(6)'s willfulness element requires that, for a debt to be
excepted from discharge, the infliction of an injury must have been
deliberate or intentional.  *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).  For
these purposes, it is not sufficient to show that a debtor was reckless,
negligent, or even that she committed a deliberate or intentional act which
resulted in injury, if the infliction of the injury itself was not deliberate or
intentional.  *Id.* at 61, 64.

MEMORANDUM OF DECISION - 15

At least in the Ninth Circuit, an injury is intentional for purposes of § 523(a)(6), if the debtor either desired to cause the injury, or believed that injury was substantially certain to result from her actions. *Carrillo v. Su* (*In re Su*), 290 F.3d 1140, 1142–43 (9th Cir. 2002). This is a subjective standard focusing on a debtor's particular state of mind, and requires a creditor to prove that the debtor had actual knowledge that harm to the creditor was substantially certain to occur. *Id.* at 1143–46. In proving a debtor's actual knowledge, the Court may consider circumstantial evidence, including an aggregation of pre-injury acts, tending to establish what the debtor must have actually known at the time he committed the conduct producing the injury. *Id.* at 1146 n.3 (citing *Spokane Ry. Credit Union v. Endicott* (*In re Endicott*), 254 B.R. 471, 477 n.9 (Bankr. D. Idaho 2000)). Even the circumstantial evidence approach, however, must be fundamentally subjective and focus on "what was actually going through the mind of the debtor at the time he acted." *Id.*

Therein lies much of the difficulty in successfully proving a § 523(a)(6) exception from discharge, particularly when relying solely on

MEMORANDUM OF DECISION - 16

circumstantial evidence.  It is not enough that a debtor's actions result in a high degree of risk of injury to others, or even that there is a high probability that injury will result.  *See id.* at 1145–46 n.4.  Instead, to justify an exception to discharge, the creditor must, at a minimum, prove that the debtor subjectively knew to a substantial certainty that injury would result from her actions.  *Id.* at 1145–46.

Creditors in this action face another evidentiary hurdle.  A creditor's debt can not be excepted from discharge based solely on the debtor's vicarious liability for acts that were committed other than "by the debtor." *See* § 523(a)(6).  *E.g.*, *Yash Raj Films v. Akhtar* (*In re Akhtar*), 368 B.R. 120, 133 (Bankr. E.D.N.Y. 2007) (explaining debtor's debt not excepted from discharge based on vicarious liability); *Sells v. Porter* (*In re Porter*), 363 B.R. 78, 89-90 n.5 (Bankr. E.D. Ark. 2007) (same); *Caci v. McDonald* (*In re Brink*), 333 B.R. 560, 568–70 (Bankr. D. Mass. 2005) (same).  Here, while Debtor was likely present when the decisions to place B.B. in the booster seat and playpen in the bedroom were made, Creditors have not shown by a preponderance of the evidence that Debtor physically participated in

MEMORANDUM OF DECISION - 17

committing those acts.  If she is to be found to have willfully injured

Creditors, it must be on account of her conduct other than the physical acts

of buckling B.B. into the seat and placing that seat in the playpen.

A state court found Debtor to be civilly liable for B.B.'s death.  *See*

Exh. 102.  Because the state court's findings might be entitled to preclusive

effect in this discharge exception action, *see Diamond v. Kolcum* (*In re*

*Diamond*), 285 F.3d 822, 828 (9th Cir. 2002), before independently

examining Debtor's conduct, the Court will first consider whether the state

court's characterization of Debtor's conduct as "reckless" is sufficient to

support a finding that Creditors' judgment debt should be excepted from

discharge per § 523(a)(6).

### 1.  The state court determination that Debtor was "reckless" does not prove she willfully injured B.B.

The state court determined Debtor's conduct towards B.B. was

"reckless."  To understand the impact of that determination on a

§ 523(a)(6) analysis, the meaning of "reckless" in the context of the state

court action must be explored.

MEMORANDUM OF DECISION - 18

In Idaho, recklessness means something different than negligence. *Hall v. Farmers Alliance Mut. Ins. Co.*, 179 P.3d 276, 288 (Idaho 2008) (quoting *Hunter v. Horton*, 333 P.2d 459, 462–63 (Idaho 1958)).  While, at one time, recklessness was also considered to be something other than "willful and wanton misconduct," those terms are now often considered to be synonymous.  *Compare Hughes v. Hudelson*, 169 P.2d 712, 716–17 (Idaho 1946), *with* IDAHO CIVIL JURY INSTRUCTION 2.25, cmt. ("There appears to be no distinction between 'reckless' and 'willful and wanton' or 'willful or wanton.'  *Hunter v. Horton*, 80 Idaho 475, 479, 333 P.2d 459 (1958); *Johnson v. Sunshine Mining Co., Inc.*, 106 Idaho 866, 873, [684] P.2d 268 (1984); *DeGroff v. Wight*, 130 Idaho 557, 944 P.2d 712 (1997).").  Willful and wanton misconduct requires a showing that misconduct included:

> intentional or reckless actions, taken under circumstances where the actor knew or should have known that the actions not only created an unreasonable risk of harm to another, but involved a high degree of probability that such harm would actually result.

*Phillips v. Erhart*, __ P.3d __, 2011 WL 2023298 (Idaho May 25, 2011).

MEMORANDUM OF DECISION - 19

Other Idaho decisions look to the Restatement (Second) of Torts'

definition of recklessness, which is:

> A person's conduct is reckless if he does an act or
> intentionally fails to do an act which it is his duty
> to the other to do, knowing or having reason to
> know of facts which would lead a reasonable
> man to realize, not only that his conduct creates
> an unreasonable risk of physical harm to another,
> but also that such risk is substantially greater
> than that which is necessary, under the
> circumstances.

*Galloway v. Walker*, 99 P.3d 625, 629–30 (Idaho Ct. App. 2004) (quoting

RESTATEMENT (SECOND) OF TORTS § 500).

It is of no moment here whether the definition of "willful and

wanton misconduct" or the Restatement "recklessness" definition is

preferred.  Both fall short of the § 523(a)(6) willfulness standard for several

reasons.

First, both definitional standards rely upon an objective test to

determine whether particular misconduct was reckless.  In contrast, the

§ 523(a)(6) willfulness standard is subjective, focusing on the intent of the

particular target debtor.  *In re Su*, 290 F.3d at 1142–43.  Second, both state

MEMORANDUM OF DECISION - 20

law standards refer to the creation of either a high degree of probability of

harm, or an unreasonable risk of harm.  Yet, the § 523(a)(6) standard goes

beyond that, and requires that a debtor know that injury will be

substantially certain to result from his conduct.  *Id.* at 1146.  Third, state

"willful and wanton misconduct" includes both "intentional" and

"reckless" actions.  Therefore, in theory, actions that are reckless under

state law may be something less than intentional.  Section 523(a)(6)

willfulness, on the other hand, requires that the debtor commit an

intentional injury; an injury resulting from anything less is not sufficient.

*Geiger*, 523 U.S. at 61, 64.

Because the state law definition of "recklessness" is different from

the § 523(a)(6) standard, the fact that a state court found Debtor's actions

in relation to B.B.'s injuries to be reckless does not prove she willfully

injured the child.  The Court must, therefore, independently determine

whether Debtor's conduct rose to the § 523(a)(6) willful injury standard.

### 2. Creditors' proof does not show that Debtor intended to injure B.B.

MEMORANDUM OF DECISION - 21

Viewed fairly, the combination of Debtor's actions more likely than not increased the risk that B.B. would suffer some sort of injury. Debtor allowed her day care to use booster seats for other than their intended purpose outside of a vehicle, and Debtor modified those booster seats from a 5-point harness to a less-secure 3-point harness. Debtor was present when the decision to place B.B. in a booster seat in a playpen was made, and she apparently approved of the decision to leave B.B. unattended, strapped in a booster seat, to cry himself to sleep. Debtor heard B.B. stop crying, and then left her day care, and all the children in attendance there, with two unpaid, untrained "helpers."

Debtor's conduct is difficult to excuse. However, that Debtor unwisely, or even recklessly, placed a small child in imminent danger, is not alone sufficient to show she subjectively intended to harm that child. *See In re Su*, 290 F.3d at 1145–46 n.4 (explaining that a reckless decision to run a red light, which created a high degree of risk, is different from being subjectively certain that injury will result from that decision). While Creditors proved Debtor left her day care in the hands of unpaid,

MEMORANDUM OF DECISION - 22

untrained assistants, they did not prove she knew doing so would be

substantially certain to result in an injury to a child.  Moreover, Creditors

proved the booster seat's owner's manual included a warning against

leaving children unattended in the seat, and that Debtor modified the

seats' harness system.  Creditors did not prove, however, that Debtor had

ever read the manual, that the modified harnesses are less safe in non-

vehicular use than a 5-point harness system, or that Debtor was otherwise

aware of the danger in leaving an infant unattended in an unsecured,

modified out-of-vehicle seat.  Rather, the evidence indicates that out-of-

vehicle car seat injuries are uncommon.  *See* Exh. 104 at 11–12.

Creditors also proved Debtor had extensive experience and training

in child care and safety procedures.  Yet, they did not prove that any of the

training covered proper toddler sleeping arrangements, the danger of

modifying car seats, the proper use of car seats, or any of the other factors

that might have contributed to B.B.'s injury.  Simply put, despite proving

various facts tending to indicate, at most, that Debtor should have known

her actions created an increased risk of injury to B.B., Creditors did not

MEMORANDUM OF DECISION - 23

prove she subjectively intended to injure B.B.

Creditors' judgment debt, therefore, is not a debt for a willful injury.

### C.    Debtor's acts toward B.B. were not malicious.

Creditors also did not show that Debtor acted maliciously toward

B.B.  To prove a debtor maliciously injured another for the purposes of

§ 523(a)(6), a creditor must show that the debtor caused an injury which

involved (1) a wrongful act, (2) done intentionally, (3) which necessarily

causes injury,  and (4) that is done without just cause or excuse.  *In re Su*,

290 F.3d at 1146–47 (quoting *Petralia v. Jercich* (*In re Jercich*), 238 F.3d 1202,

1209 (9th Cir. 2001)).

The difficulty for Creditors in this case is that, to support an

exception to discharge, the wrongful, intentionally committed, act must, of

necessity, cause an injury.  *Id.*  Whether an injury resulted from an alleged

malicious act in a particular case is irrelevant; rather, the inquiry is

whether the situation into which a debtor placed the creditor "is certain or

almost certain" to cause harm.  *Transamerica Commercial Fin. Corp. v.*

*Littleton* (*In re Littleton*), 942 F.2d 551, 555 (9th Cir. 1991).

MEMORANDUM OF DECISION - 24

Debtor allowed untrained assistants to strap a crying and fussing B.B. into a modified car seat, to place him and the seat in a playpen in another room, and then to leave him unattended.  When B.B. stopped crying, and without checking on him, Debtor left the day care to run an errand.  While Debtor's acts likely increased the risk of an injury to B.B., they did not create a situation where injury was certain to result.

Debtor's conduct toward B.B. was not malicious for purposes of § 523(a)(6).

## II.   Fifth Amendment.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. CONST. amend V.  The privilege against self-incrimination applies in bankruptcy proceedings.  *In re Ross*, 156 B.R. 272, 274 (Bankr. D. Idaho 1993) (citing *McCarthy v. Arndstein*, 266 U.S. 34, 41 (1924)).  A debtor may assert the privilege if presented with a real hazard of incrimination, and the privilege protects information that might provide a lead or clue to evidence that has the tendency to incriminate, in

MEMORANDUM OF DECISION - 25

addition to information that would support a criminal conviction. *Id.*
(quoting *United States v. Paris*, 827 F.2d 395, 398 (9th Cir. 1987); *United
States v. Neff*, 615 F.2d 1235, 1239 (9th Cir. 1980)).

Here, Debtor's evidence showed that, at least as of June 29, 2010, the
Twin Falls Police Department continued to investigate B.B.'s death. *See*
Exh. 200. Debtor's testimony in this adversary proceeding, if given, could
well have provided a lead or clue to evidence which might incriminate her
in any criminal investigation. The Court, therefore, allowed Debtor to
assert the Fifth Amendment privilege against self-incrimination at trial.

Creditors, however, argue that, by invoking the privilege, Debtor
impermissibly used the Fifth Amendment as a shield, while at the same
time using the Bankruptcy Code as a sword to take unfair advantage of
Creditors. In support of their position, Creditors cite case law finding that,
because of the bankruptcy system's noncriminal statutory scheme, which
allows debtors a fresh start while ensuring maximum recovery for
creditors through disclosure and examination, a debtor cannot enjoy the
discharge benefit of bankruptcy while avoiding its disclosure and

MEMORANDUM OF DECISION - 26

examination burdens through the exercise of the Fifth Amendment privilege.  *See, e.g.*, *Charter Fed. Savings Assoc. v. Rezak* (*In re Lederman*), 140 B.R. 49, 52–53 (Bankr. E.D.N.Y. 1992).

At the same time, the Code's discharge provisions provide that a debtor cannot be denied a discharge for asserting her Fifth Amendment privilege, unless she has been granted immunity and still refuses to testify. § 727(a)(6).  Even so, some decisions attempt to make the distinction between a debtor's general discharge under § 727 and an exception from discharge under § 523.  *See In re Lederman*, 140 B.R. at 53 (quoting *Piperi v. Gutierrey* (*In re Piperi*), 137 B.R. 644, 647 (Bankr. S.D. Tex. 1991)). Essentially, those courts reason that, because the Code specifically preserves a debtor's right to raise the Fifth Amendment privilege in § 727, but does not do so in § 523, there is an "inescapable conclusion" that Congress did not preserve a debtor's right to raise the privilege in the context of § 523 exceptions from discharge.  *Id.*  Respectfully, in this Court's opinion, that view of such a critical Constitutional protection is excessively myopic, and requires an analytical construct that is

MEMORANDUM OF DECISION - 27

inconsistent with the operation of the Code.

Analysis of a debtor's discharge begins with § 727, which provides that a chapter 7 debtor typically receives a discharge of all his pre-petition debts.  *See* §§ 727(a), (b).  A debtor cannot be denied the discharge because he has asserted the Fifth Amendment privilege against self-incrimination. § 727(a)(6); *see In re Ross*, 156 B.R. at 275.  If a discharge of all of a debtor's pre-petition debts is warranted, the Code then directs:  "*A discharge under section 727 . . . does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity.*"  § 523(a)(6) (emphasis added).

In this bankruptcy case, Debtor's debt to Creditors dwarfs all of her other obligations.  It would be illogical, on the one hand, to protect Debtor's right to discharge all of her pre-petition debts in spite of invoking the Fifth Amendment privilege while, on the other hand, excepting Creditors' debt from discharge solely because she invoked that privilege. Either discharge can be denied due to a Debtor's invocation of the Fifth Amendment privilege, or it can not.  Congress has said it can not.

MEMORANDUM OF DECISION - 28

§ 727(a)(6).

## Conclusion

The nature of Creditors' loss in this case must surely make the

dischargeability of their default judgment against Debtor seem unjust.

Based upon the evidence, Debtor, and likely others, were responsible for

the death of B.B.  However, that Debtor is obligated under state law to

compensate Creditors for their loss does not impair her right to seek relief

from that debt under the Bankruptcy Code.

Creditors did not prove that Debtor willfully or maliciously injured

B.B. or Creditors.  Exception of their judgment debt from discharge

pursuant to § 523(a)(6) is unwarranted.  And the fact that Debtor invoked

the Fifth Amendment privilege against self-incrimination does not, in and

of itself, warrant excepting Creditors' debt from discharge.

Debtor's liability to Creditors under the state court judgment is

dischargeable.  A separate judgment will be entered.

Dated:  July 27, 2011

MEMORANDUM OF DECISION - 29

_____

Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 30